UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Todd David Morrow

Chapter 13
Case No. 19-43134 KHS

Debtor.

---

NOTICE OF HEARING, OBJECTION TO CONFIRMATION OF PLAN

---

TO:    Todd D. Morrow, and other entities specified in Local Rule 3015-3.

Secured creditor Select Portfolio Servicing, Inc. as servicer for Wilmington Trust, N.A., successor Trustee to CitiBank, N.A., as Trustee on Behalf of the Registered Holders of Bear Stearns Asset Backed Securities I Trust 2006-HE3, Asset-Backed Certificates, Series 2006-HE3 ("SPS") hereby gives notice of a hearing, and objects to the confirmation of the plan proposed by the debtors.

1.      The objection to confirmation of the plan will be heard at the confirmation hearing on the Debtor's Chapter 13 Plan scheduled at 10:30 am on December 19, 2019, in Courtroom 8 West, U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415 or as soon thereafter as counsel can be heard.

2.      This court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, Federal Rules of Bankruptcy Procedure 5005 and Local Rule 1070-1. This proceeding is a core proceeding.  The petition commencing this Chapter 13 case was filed on October 16, 2019.  The case is now pending in this court.

3.      This objection arises under 11 U.S.C. §§ 1322, 1324, and 1325 and Federal Rules of Bankruptcy Procedure 1017(d), 3015(f), 9014 and Local Rules 3015-

3, 3020-1, and 3020-3.  SPS requests denial of confirmation of Debtor's Chapter 13 Plan.

4.      The Debtor commenced a Chapter 13 proceeding on October 16, 2019 as Case No. 19-43134.  At the time of filing, Debtor owed an estimated delinquency to SPS in the amount of $127,838.66.

5.      Wilmington Trust, N.A., successor Trustee to CitiBank, N.A., as Trustee on Behalf of the Registered Holders of Bear Stearns Asset Backed Securities I Trust 2006-HE3, Asset-Backed Certificates, Series 2006-HE3 is the assignee of a first mortgage interest in the Debtor's homestead located at: 12650 Xebec St NE, Blaine, MN 55449, and legally described as:

EXHIBIT "A"

THE NORTH ONE-HALF OF THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 2, TOWNSHIP 31, RANGE 23, ANOKA COUNTY, MINNESOTA, TOGETHER WITH A 66 FOOT WIDE NON-EXCLUSIVE ROAD EASEMENT OVER PART OF THE SOUTH HALF OF SECTION 2, TOWNSHIP 31, RANGE 23, ANOKA COUNTY, MINNESOTA, THE CENTERLINE OF WHICH IS DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF A LINE WHICH IS 33 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SAID SECTION 2 AND THE SOUTH LINE OF SAID SECTION 2; THENCE NORTH ALONG SAID PARALLEL LINE TO ITS INTERSECTION WITH THE NORTH LINE OF SOUTH HALF OF SAID SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER; THENCE WEST ALONG THE LAST DESCRIBED NORTH LINE TO THE WEST LINE OF THE EAST HALF OF SAID SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH ALONG SAID WEST LINE AND THE WEST LINE OF THE EAST HALF OF THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER TO THE NORTH LINE OF THE SOUTH HALF OF THE SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER, SAID LAST DESCRIBED POINT BEING HEREAFTER KNOWN AS POINT "AA"; THENCE WEST ALONG LAST DESCRIBED NORTH LINE AND THE NORTH LINE OF SOUTH HALF OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER, TO THE WEST LINE OF EAST HALF OF THE SAID NORTHEAST QUARTER OF THE SOUTHWEST QUARTER, SAID LAST DESCRIBED POINT HEREAFTER TO BE KNOWN AS POINT "BB"; THENCE NORTH ALONG THE WEST LINE OF THE EAST HALF OF THE SAID NORTHEAST QUARTER OF THE SOUTHWEST QUARTER TO THE SOUTH LINE OF THE NORTH HALF OF THE NORTH HALF OF SAID NORTHEAST QUARTER OF THE SOUTHWEST QUARTER, SAID LAST POINT BEING THE POINT OF BEGINNING OF A TEMPORARY RECTANGULAR TURNAROUND EASEMENT DESCRIBED AS FOLLOWS: THENCE WEST ALONG THE SAID SOUTH LINE OF NORTH HALF OF THE NORTH HALF A DISTANCE OF 87 FEET; THENCE NORTH AND PARALLEL WITH THE WEST LINE OF EAST HALF OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION 2 A DISTANCE OF 100 FEET; THENCE EAST AND PARALLEL WITH THE SOUTH LINE OF SAID NORTH HALF OF NORTH HALF A DISTANCE OF 120 FEET; THENCE SOUTH AND PARALLEL WITH THE SAID WEST LINE OF THE EAST HALF OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER A DISTANCE OF 100 FEET; THENCE WEST TO THE LAST DESCRIBED POINT OF BEGINNING. THE FOLLOWING IS THE CONTINUATION OF A 66 FOOT ROAD EASEMENT; COMMENCING AT AFOREMENTIONED POINT "BB"; THENCE SOUTH ALONG THE WEST LINE OF EAST HALF OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION 2 TO NORTH LINE OF THE SOUTH HALF OF THE SOUTH HALF OF SAID NORTHEAST QUARTER OF THE SOUTHWEST QUARTER SAID LAST DESCRIBED POINT, BEING THE POINT OF BEGINNING OF A TEMPORARY RECTANGULAR TURNAROUND EASEMENT DESCRIBED AS FOLLOWS; THENCE WEST ALONG THE NORTH LINE OF THE SAID LAST DESCRIBED SOUTH HALF OF SOUTH HALF FOR A DISTANCE OF 60 FEET; THENCE SOUTH AND PARALLEL WITH THE SAID WEST LINE OF THE EAST HALF OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER A DISTANCE OF 100 FEET; THENCE EAST PARALLEL, WITH SAID NORTH LINE OF THE SOUTH HALF OF SOUTH HALF FOR A DISTANCE OF 120 FEET; THENCE NORTH PARALLEL WITH THE LAST SAID WEST LINE A DISTANCE OF 100 FEET; THENCE WEST TO THE LAST DESCRIBED POINT OF BEGINNING. THE FOLLOWING IS A CONTINUATION OF A 66 FOOT WIDE ROAD EASEMENT; COMMENCING AT AFORESAID POINT "AA" THENCE NORTH ALONG THE WEST LINE OF THE EAST HALF OF NORTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SAID SECTION 2 TO THE SOUTH LINE OF THE NORTH HALF OF THE NORTH HALF OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER, SAID LAST DESCRIBED POINT BEING THE POINT OF BEGINNING OF A TEMPORARY RECTANGULAR

TURNAROUND EASEMENT DESCRIBED AS FOLLOWS: THENCE EAST ALONG THE LAST DESCRIBED SOUTH LINE OF THE NORTH HALF OF THE NORTH HALF A DISTANCE OF 60 FEET; THENCE NORTH AND PARALLEL WITH THE WEST LINE OF THE EAST HALF OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER A DISTANCE OF 100 FEET; THENCE WEST ALONG A LINE PARALLEL WITH LAST DESCRIBED SOUTH LINE OF THE NORTH HALF OF THE NORTH HALF A DISTANCE OF 120 FEET; THENCE SOUTH PARALLEL WITH LAST DESCRIBED WEST LINE OF THE EAST HALF A DISTANCE OF 100 FEET; THENCE EAST TO THE LAST DESCRIBED POINT OF BEGINNING AND THERE TERMINATING, ANOKA COUNTY, MINNESOTA.

6.      The mortgage is dated September 8, 2005, and was recorded in the office of the county recorder September 23, 2005, as Document No. 1978436.002 in the original amount of $316,000.00. (Exhibit A; Mortgage)

7.      The plan is objected to on the basis that the Debtor was delinquent on pre-petition estimated arrears in the amount of $127,838.66. Currently, the plan provides for payment of the arrears in the amount of $108,000.00. Therefore, the plan does not comply with the provisions of Chapter 13 of the Bankruptcy code as contemplated by 11 U.S.C §1325(a)(1) and (6).

8.      The plan does not comply with the provisions of the Bankruptcy Code as required by 11 U.S.C. section 1325(a)(1) because it lists SPS's secured claim under Part 7 of the proposed plan with insufficient arrears to cure the prepetition debt. This is a violation of Section 1322(b)(2).

WHEREFORE, SPS respectfully requests that the Court deny confirmation of the Plan, and such other and further relief as may be just and equitable.

Dated: November 27, 2019

USSET, WEINGARDEN & LIEBO, P.L.L.P.


By: /E/ Kevin T. Dobie
Kevin T. Dobie #388322
4500 Park Glen Road, #300
Minneapolis, MN  55416
(952) 925-6888
kevin@uwllaw.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Todd David Morrow

                                                   Chapter 13
                                    Case No. 19-43134 KHS

Debtor.

---

VERIFICATION

---

**Document Control Officer**

Sherri Zombro

_____, a _____ of Select Portfolio Servicing, Inc.

as servicer for Wilmington Trust, N.A., successor Trustee to CitiBank, N.A., as

Trustee on Behalf of the Registered Holders of Bear Stearns Asset Backed Securities

I Trust 2006-HE3, Asset-Backed Certificates, Series 2006-HE3 states:

1.      That he/she is an employee of Select Portfolio Servicing, Inc. as servicer for

Wilmington Trust, N.A., successor Trustee to CitiBank, N.A., as Trustee on Behalf of

the Registered Holders of Bear Stearns Asset Backed Securities I Trust 2006-HE3,

Asset-Backed Certificates, Series 2006-HE3.

2.      That he/she has reviewed the foregoing Objection to Confirmation of the

Debtor's Plan and it is true and correct according the best of his/her knowledge,

information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 11/21/2019

By: _____
                Sherri Zombro
           Document Control Officer
      **Select Portfolio Servicing, Inc.**
        3217 S. Decker Lake Drive
        Salt Lake City, Utah 84119

-1-

ANOKA COUNTY MINNESOTA
Document No.:  1978436.002 ABSTRACT
I hereby certify that the within instrument was filed in this
office for record on: 09/23/2005 11:11:00 AM
Fees Taxes In the Amount of:  $777.80
MAUREEN J. DEVINE
Anoka County Property Tax
Administrator/Recorder/Registrar of Titles
BMC, Deputy

Record ID:   1605791

# Exhibit A

Record ID 1605791

# 1978436.002

——————————[Space Above This Line For Recording Data]——————————

# MORTGAGE

~~Return To:~~
MARIBELLA MORTGAGE, LLC

3600 MINNESOTA DR, SUITE 650
EDINA, MN, 55435
866-262-6413

**Premier Title**

*Return to:*
TIMBERLAND TITLE, LLC
4105 N. LEXINGTON AVENUE, SUITE 350
ARDEN HILLS, MN 55126-6108

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   SEPTEMBER 8TH, 2005                 ,
together with all Riders to this document.

---

MINNESOTA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3024  1/ 01

-6A(MN) (0005).01
Page 1 of 15                    Initials: T.M.

VMP MORTGAGE FORMS - (800)521-7291

(B) "Borrower" is  TODD MORROW,  AS  A  SINGLE PERSON

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.**

(D) "Lender" is  MARIBELLA MORTGAGE, LLC

Lender is a  A LIMITED LIABILITY CORPORATION
organized and existing under the laws of  THE STATE OF MINNESOTA
Lender's address is 3600 MINNESOTA DR, SUITE 650, EDINA, MN, 55435

(E) "Note" means the promissory note signed by Borrower and dated  SEPTEMBER 8TH, 2005
The Note states that Borrower owes Lender  THREE HUNDRED SIXTEEN THOUSAND AND
NO/100.                                                                                Dollars
(U.S. $      316,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  OCTOBER 1ST, 2035 .

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
|---|---|---|
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |

PREPAYMENT PENALTY RIDER
INTEREST ONLY RIDER

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

Initials: T. M.

-6A(MN) (0005).01                        Page 2 of 15                        Form 3024   1/01

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the
COUNTY                    of                    :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]:

SEE LEGAL DESCRIPTION ATTACHED.

Parcel ID Number:                                        which currently has the address of
                              12650 XEBEC ST NE                              [Street]
                    BLAINE                    [City], Minnesota    55449    [Zip Code]
("Property Address"):

Initials: TrIh

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Initials: T, M,

-6A(MN) (0005).01                     Page 4 of 15                     Form 3024   1/01

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Initials: T. M.

Form 3024   1/01

-8A(MN) (0005).01

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

Initials: T. M.

-6A(MN) (0005).01

Page 6 of 15

Form 3024   1/01

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's

knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and



Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless

Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal

Initials: T, M,

owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument at the time such documents are executed or within a reasonable time thereafter.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security

Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

   **20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

   Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

   **21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

   Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Initials: 

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower by certified mail to the address of the Property or another address designated by Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees.

If Lender invokes the power of sale, Lender shall cause a copy of a notice of sale to be served upon any person in possession of the Property. Lender shall publish a notice of sale, and the Property shall be sold at public auction in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

**25. Interest on Advances.** The interest rate on advances made by Lender under this Security Instrument shall not exceed the maximum rate allowed by Applicable Law.

Initials: 

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          TODD MORROW                    -Borrower


_____          _____ (Seal)
                                                                         -Borrower


_____ (Seal)   _____ (Seal)
                        -Borrower                                         -Borrower


_____ (Seal)   _____ (Seal)
                        -Borrower                                         -Borrower


_____ (Seal)   _____ (Seal)
                        -Borrower                                         -Borrower

STATE OF MINNESOTA,                    RAMSEY                              County ss:

    On this      8TH      day of        SEPTEMBER 2005              , before me appeared
TODD MORROW

to me personally known to be the person(s) described in and who executed the foregoing instrument and
acknowledged that he/she/they executed the same as his/her/their free act and deed.



Notary Public

My Commission Expires: 1|31|2010

> JESSICA TROUP
> NOTARY PUBLIC - MINNESOTA
> My Commission Expires Jan. 31st 2010

This instrument was drafted by: CHRISTINE SWITZER
3600 Minnesota Dr. Ste 850
Edina, MN 55435

Tax statements for the real property described in this instrument should be sent to:

Initials: TM

# ADJUSTABLE RATE RIDER



### (6-Month LIBOR Index - Rate Caps)
**(Assumable during Life of Loan) (First Business Day of Preceding Month Lookback)**

THIS ADJUSTABLE RATE RIDER is made this  **8TH**  day of **SEPTEMBER 2005**      ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to
**MARIBELLA MORTGAGE, LLC**

(the "Lender") of the same date and covering the property described in the Security
Instrument and located at:

**12650 XEBEC ST NE, BLAINE, MN  55449**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows :

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of         **7.250**          %. The Note
provides for changes in the interest rate and the monthly payments, as follows :

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
**(A) Change Dates**
The interest rate I will pay may change on the first day of   **OCTOBER 2007**           ,
and may change on that day every sixth month thereafter. Each date on which my interest
rate could change is called a "Change Date."

**MULTISTATE ADJUSTABLE RATE RIDER 6-Month LIBOR Index (Assumable during Life of
Loan) (First Business Day Lookback) - Single Family - Freddie Mac UNIFORM INSTRUMENT**

**-81 5R (040 5)  Form 5120  3/04**
®
Page 1 of 4          Initials: ⊤ı ⎰M⎱
VMP Mortgage Solutions
(80 0)521 -7291

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **FIVE AND SEVEN EIGHTHS** percentage point(s) (     5.875      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than     10.250     % or less than     7.250     %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **ONE** percentage point(s) (     1.000     %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than     13.250     %.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

Initials: _____

-81 5R (040 5)                     Page 2 of 4                        Form 5120  3/04

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest In Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials: T, M,

VMP®-815R (0405)                    Page 3 of 4                    Form 5120  3/04

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
TODD MORROW                -Borrower                                      -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                      -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                      -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                      -Borrower


-81 5R (040 5)                      Page 4 of 4                      Form 5120  3/04

# INTEREST-ONLY ADDENDUM
# TO ADJUSTABLE RATE RIDER

Property Address:  **12650 XEBEC ST NE**
                   **BLAINE, MN  55449**

THIS ADDENDUM is made this **8TH  DAY OF SEPTEMBER** 2005
and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider")
dated the same date as THIS ADDENDUM supersedes Section 4(C) of the Rider.  None of the other
provisions of the Note are changed by this Addendum.

4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

(C)  Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **9.875%**
**NINE AND SEVEN EIGHTHS**
to the Current Index for such change Change Date.  The Note Holder will then round the result of
this addition to the nearest          **ONE EIGHTH**
Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate
until the next Change Date.

During the Interest-Only Period, the Note holder will then determine that amount of the monthly
payment that would be sufficient to repay accrued interest.  This will be the amount of my
monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period
unless I make a voluntary prepayment of principal during the Interest-Only Period, my payment
amount for subsequent payments will be reduced to the amunt necessary to pay interest at the
then current interest rate on the lower principal balance.  At the end of the Interest-Only
Period and on each change date thereafter, the Note Holder will determine the amount of the
monthly payment that would be sufficient to repay in full the unpaid prinicpal that I am
expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal
monthly payments over the remaining term of the Note.  The result of this calculation will be
the new amount of my monthly payment.  After the end of the Interest-Only Period, my payment
amount will not be reduced due to voluntary prepayments.

_Todd Morrow_ 9-7-05                              _____
TODD MORROW          Date                              Date


_____                       _____
          Date                                          Date

# PREPAYMENT RIDER

**THIS PREPAYMENT RIDER** is made this **8TH    DAY OF    SEPTEMBER    2005**
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

MARIBELLA MORTGAGE, LLC

of the same date and covering the Property described in the Security Instrument and located at:
12650 XEBEC ST NE BLAINE, MN  55449

**PREPAYMENT COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
I have the right to make payments of principal at any time before they are due.  A prepayment of all of the unpaid principal is known as a  "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."
Except as provided below, I may make a full prepayment or partial prepayment at any time without paying any penalty.  However, if within the first  **TWO ( 2)**    years after the execution of the Security Instrument I make full prepayment, I will pay a prepayment charge in the amount equal to the payment of two (2) months' advance interest on the amount prepaid which is in excess of two percent (2%) of the original principal amount.
If I make a partial prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a partial prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.
This section does not permit the imposition of a prepayment penalty in the event that the property securing the mortgage loan is sold or the mortgage loan is prepaid in part.  No prepayment penalty may be enforced after    **24**    months from the date of the mortgage loan.

**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and provisions contained in this Prepayment Rider.

_____    9-7-05
TODD MORROW         Date

_____
Date

_____
Date

_____
Date

EXHIBIT "A"

THE NORTH ONE-HALF OF THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF THE
SOUTHEAST QUARTER OF SECTION 2, TOWNSHIP 31, RANGE 23, ANOKA COUNTY, MINNESOTA,
TOGETHER WITH A 66 FOOT WIDE  NON-EXCLUSIVE ROAD EASEMENT OVER PART OF THE SOUTH
HALF OF SECTION 2, TOWNSHIP 31, RANGE 23, ANOKA COUNTY, MINNESOTA, THE CENTERLINE OF
WHICH IS DESCRIBED AS FOLLOWS:  BEGINNING AT THE INTERSECTION OF A LINE WHICH IS 33 FEET
WEST OF AND PARALLEL WITH THE EAST LINE OF THE SOUTHWEST QUARTER OF THE SOUTHEAST
QUARTER OF SAID SECTION 2 AND THE SOUTH LINE OF SAID SECTION 2; THENCE NORTH ALONG
SAID PARALLEL LINE TO ITS INTERSECTION WITH THE NORTH LINE OF SOUTH HALF OF SAID
SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER; THENCE WEST ALONG THE LAST DESCRIBED
NORTH LINE TO THE WEST LINE OF THE EAST HALF OF SAID SOUTHWEST QUARTER OF THE
SOUTHEAST QUARTER; THENCE NORTH ALONG SAID WEST LINE AND THE WEST LINE OF THE EAST
HALF OF THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER TO THE NORTH LINE OF THE
SOUTH HALF OF THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER, SAID LAST
DESCRIBED POINT BEING HEREAFTER KNOWN AS POINT "AA"; THENCE WEST ALONG LAST
DESCRIBED NORTH LINE AND THE NORTH LINE OF SOUTH HALF OF THE NORTHEAST QUARTER OF
THE SOUTHWEST QUARTER, TO THE WEST LINE OF EAST HALF OF THE SAID NORTHEAST QUARTER
OF THE SOUTHWEST QUARTER, SAID LAST DESCRIBED POINT HEREAFTER TO BE KNOWN AS POINT
"BB"; THENCE NORTH ALONG THE WEST LINE OF THE EAST HALF OF THE SAID NORTHEAST QUARTER
OF THE SOUTHWEST QUARTER TO THE SOUTH LINE OF THE NORTH HALF OF THE NORTH HALF OF
SAID NORTHEAST QUARTER OF THE SOUTHWEST QUARTER,SAID LAST POINT BEING THE POINT OF
BEGINNING OF A TEMPORARY RECTANGULAR TURNAROUND EASEMENT DESCRIBED AS FOLLOWS:
THENCE WEST ALONG THE SAID SOUTH LINE OF NORTH HALF OF THE NORTH HALF A DISTANCE OF
87 FEET; THENCE NORTH AND PARALLEL WITH THE WEST LINE OF EAST HALF OF THE NORTHEAST
QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION 2 A DISTANCE OF 100 FEET; THENCE
EAST AND PARALLEL WITH THE SOUTH LINE OF SAID NORTH HALF OF NORTH HALF A DISTANCE OF
120 FEET; THENCE SOUTH AND PARALLEL WITH THE SAID WEST LINE OF THE EAST HALF OF THE
NORTHEAST QUARTER OF THE SOUTHWEST QUARTER A DISTANCE OF 100 FEET; THENCE WEST TO
THE LAST DESCRIBED POINT OF BEGINNING.  THE FOLLOWING IS THE CONTINUATION  OF  A 66 FOOT
ROAD EASEMENT;  COMMENCING AT AFOREMENTIONED POINT "BB"; THENCE SOUTH ALONG THE
WEST LINE OF EAST HALF OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SAID
SECTION 2 TO NORTH LINE OF THE SOUTH HALF OF THE SOUTH HALF OF SAID NORTHEAST
QUARTER OF THE SOUTHWEST QUARTER SAID LAST DESCRIBED POINT, BEING THE POINT OF
BEGINNING OF A TEMPORARY RECTANGULAR TURNAROUND EASEMENT DESCRIBED AS FOLLOWS;
THENCE WEST ALONG THE NORTH LINE OF THE SAID LAST DESCRIBED SOUTH HALF OF SOUTH
HALF FOR A DISTANCE OF 60 FEET;  THENCE SOUTH AND PARALLEL WITH THE SAID WEST LINE OF
THE EAST HALF OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER A DISTANCE OF 100
FEET; THENCE EAST PARALLEL, WITH SAID  NORTH LINE OF THE SOUTH HALF OF SOUTH HALF FOR A
DISTANCE OF 120 FEET; THENCE NORTH PARALLEL WITH THE LAST SAID WEST LINE A DISTANCE OF
100 FEET; THENCE WEST TO THE LAST DESCRIBED POINT OF BEGINNING.  THE FOLLOWING IS A
CONTINUATION OF A 66 FOOT WIDE ROAD EASEMENT;  COMMENCING AT AFORESAID POINT "AA"
THENCE NORTH ALONG THE WEST LINE OF THE EAST HALF OF NORTHWEST QUARTER OF THE
SOUTHEAST QUARTER OF SAID SECTION 2 TO THE SOUTH  LINE OF THE NORTH HALF OF THE
NORTH HALF OF SAID NORTHWEST QUARTER OF THE SOUTHEAST  QUARTER, SAID LAST
DESCRIBED POINT BEING THE POINT OF BEGINNING OF A TEMPORARY RECTANGULAR

TURNAROUND EASEMENT DESCRIBED AS FOLLOWS:  THENCE EAST ALONG THE LAST DESCRIBED
SOUTH  LINE OF THE NORTH HALF OF THE NORTH HALF A DISTANCE OF 60 FEET;  THENCE NORTH
AND PARALLEL  WITH THE WEST LINE OF THE EAST HALF OF SAID NORTHWEST QUARTER OF THE
SOUTHEAST QUARTER A  DISTANCE OF 100 FEET; THENCE WEST ALONG A LINE PARALLEL WITH
LAST DESCRIBED SOUTH LINE OF  THE NORTH HALF OF THE NORTH HALF A DISTANCE OF 120 FEET;
THENCE SOUTH PARALLEL WITH LAST DESCRIBED WEST LINE OF THE EAST HALF A DISTANCE OF
100 FEET; THENCE EAST TO THE LAST DESCRIBED POINT OF BEGINNING AND THERE TERMINATING,
ANOKA COUNTY, MINNESOTA.

ANOKA COUNTY MINNESOTA
Document No.:  2028328.009 ABSTRACT
I hereby certify that the within instrument was filed in this
office for record on: 02/21/2012 12:42:00 PM
Fees/Taxes In the Amount of:  $46.00
LARRY W. DALIEN
Anoka County Property Tax
Administrator/Recorder/Registrar of Titles
NLW, Deputy

Record ID:   2471700

Record ID 2471700

# 2028328.009

## ASSIGNMENT OF MORTGAGE

-- -- Contact JPMORGAN CHASE BANK, N.A. for this instrument 780 Kansas Lane, Suite A, Monroe, LA 71203, telephone # (866) 756-8747, which is responsible for receiving payments.

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR MARIBELLA MORTGAGE LLC, ITS SUCCESSORS AND ASSIGNS, (ASSIGNOR), (MERS Address: P.O. Box 2026, Flint, Michigan 48501-2026) by these presents does convey, grant, sell, assign, transfer and set over the described MORTGAGE with all interest secured thereby, all liens, and any rights due or to become due thereon to CITIBANK, N.A., AS TRUSTEE FOR BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2006-HE3, ASSET BACKED-CERTIFICATES, SERIES 2006-HE3, WHOSE ADDRESS IS 700 KANSAS LANE, MC 8000, MONROE, LA 71203 (866)756-8747, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).

Said MORTGAGE was dated 09/08/2005, by: TODD MORROW AS A SINGLE PERSON to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC and filed for record on 09/23/2005 as Document # 1978436.002 (or Book n/a, Page n/a), in the office of the County recorder of ANOKA, Minnesota.
Dated on 02 / 01 / 2012 (MM/DD/YYYY)
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR MARIBELLA MORTGAGE LLC, ITS SUCCESSORS AND ASSIGNS

By: _____
    Tobias Bryant
    VICE PRESIDENT

STATE OF FLORIDA    COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on 02 / 01 / 2012 (MM/DD/YYYY), by Tobias Bryant as VICE PRESIDENT for MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR MARIBELLA MORTGAGE LLC, ITS SUCCESSORS AND ASSIGNS, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

_____
MIRANDA AVILA
Notary Public - State of FLORIDA
Commission expires: 08/22/2014

Miranda Avila
Notary Public State of Florida
My Commission # EE 019063
Expires August 22, 2014

Prepared By/Return To:
E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

ANOKA COUNTY MINNESOTA

Document No:   2133370.001 ABSTRACT

I hereby certify that the within instrument was filed in this office for record on 04/01/2016  10:31:06 AM

Fees/Taxes in the amount of:  $46.00

Jonell M. Sawyer  Deputy:  Pam LeBlanc

Anoka County Property Tax
Administrator/Recorder/Registrar of Titles

Record ID: 3846087

## CORPORATE ASSIGNMENT OF MORTGAGE

Assignment Prepared on: March 21, 2016

**Assignor:** **CITIBANK, N.A., AS TRUSTEE FOR BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2006-HE3, ASSET BACKED-CERTIFICATES, SERIES 2006-HE3 BY SELECT PORTFOLIO SERVICING, INC. ITS ATTORNEY IN FACT,** at C/O SELECT PORTFOLIO SERVICING, INC., 3217 S. DECKER LAKE DRIVE, SALT LAKE CITY, UT, 84119

**Assignee:** **WILMINGTON TRUST, NA, SUCCESSOR TRUSTEE TO CITIBANK NA, AS TRUSTEE ON BEHALF OF THE REGISTERED HOLDERS OF BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2006-HE3, ASSET-BACKED CERTIFICATES, SERIES 2006-HE3,** at C/O SELECT PORTFOLIO SERVICING, INC., 3217 S. DECKER LAKE DRIVE, SALT LAKE CITY, UT, 84119

For value received, the Assignor does hereby grant, sell, assign, transfer and convey, unto the above-named Assignee all interest under that certain Mortgage dated 9/8/2005, in the amount of $316,000.00, executed by TODD MORROW, AS A SINGLE PERSON to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR MARIBELLA MORTGAGE, LLC ITS SUCCESSORS AND ASSIGNS and Recorded: 9/23/2005, Instrument No.; 1978436.002 in ANOKA County, State of MINNESOTA.
Property Address:  12650 XEBEC ST NE, BLAINE, MN, 55449

TO HAVE AND TO HOLD, the same unto Assignee, its successors and assigns, forever, subject only to the terms and conditions of the above-described Mortgage.

CITIBANK, N.A., AS TRUSTEE FOR BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2006-HE3, ASSET BACKED-CERTIFICATES, SERIES 2006-HE3 BY SELECT PORTFOLIO SERVICING, INC. ITS ATTORNEY IN FACT

On: **MAR 2 8 2016**

Signature: _____
Name:    Bill Koch
Title:     Document Control Officer

State of  UTAH
County of  SALT LAKE

On **MAR 2 8 2016** , before me, ___Angela Kay Peterson___ , a Notary Public in and for SALT LAKE in the State of UTAH, personally appeared Bill Koch, Document Control Officer, CITIBANK, N.A., AS TRUSTEE FOR BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2006-HE3, ASSET BACKED-CERTIFICATES, SERIES 2006-HE3 BY SELECT PORTFOLIO SERVICING, INC. ITS ATTORNEY IN FACT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____
Angela Kay Peterson
Notary Expires: _2-19-2020_ / #: _687390_

**Document Prepared by:** BILL KOCH, SELECT PORTFOLIO SERVICING, INC. , 3217 S. DECKER LAKE DRIVE, SALT LAKE CITY, UT, 84119, (800) 258-8602
**When Recorded Return To:**  Bill Koch, SELECT PORTFOLIO SERVICING, INC., 3217 S. DECKER LAKE DRIVE, SALT LAKE CITY, UT, 84119

**MN/ANOKA**



Angela Kay Peterson
Notary Public  State of Utah
My Commission Expires on:
February 19, 2020
Comm. Number: 687390

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Todd David Morrow

Chapter 13
Case No. 19-43134 KHS

Debtor.

---

MEMORANDUM OF LAW

---

**FACTS**

The facts in this matter are as detailed in the objection which are incorporated herein by reference.  Select Portfolio Servicing, Inc. as servicer for Wilmington Trust, N.A., successor Trustee to CitiBank, N.A., as Trustee on Behalf of the Registered Holders of Bear Stearns Asset Backed Securities I Trust 2006-HE3, Asset-Backed Certificates, Series 2006-HE3 ("SPS") is a secured creditor of the debtor and holds a perfected first mortgage on the debtor's principal residence. The pre-petition estimated arrearage owed to SPS is in the amount of $127,838.66. The Debtor has not made appropriate provisions in the plan to cure the pre-petition arrearage. SPS submits this Memorandum of Law in Support of its Objection to Confirmation of Plan.

## ARGUMENT

### I. The Debtors' Plan Should Not Be Confirmed Because It Impermissibly Modifies SPS's Secured Claim.

By including SPS's claim in Part 7 of the Plan with insufficient arrears to cure the prepetition debt, the debtor is attempting to modify a secured claim on the debtor's principal residence. Section 1322(b) of the Bankruptcy Code provides as follows:

> Subject to subsections (a) and (c) of this section, the plan may— . . .
> 2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . ;
> 5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;

11 U.S.C. § 1322(b)(2) and 1322(b)(5). Section 1325(a) provides,

> Except as provided in subsection (b), the court shall confirm a plan if—
> …The plan complies with the provisions of this chapter and with the other applicable provisions of this title; …

11 U.S.C. § 1325(a).  SPS is a secured creditor of debtor whose claim is secured only by the debtor's principal residence. The estimated pre-petition arrears owed to SPS is in the amount of $127,838.66. The Plan does not cure the prepetition delinquency owed to SPS. SPS should be included in Part 7 for home mortgages in default with arrears in the amount of $127,838.66 because the amounts secured by the lien and the duration of the lien may not be modified by the debtor's plan.

II.    **The Debtors' Plan Should Not Be Confirmed Because the Plan does not cure the pre-petition arrearages due within a reasonable period of time.**

The Plan does not provide the required payments to SPS for its secured claim. Section 1325(a)(1) requires that a debtor's plan comply with the provisions of Chapter 13. Section 1322(b)(5) requires the curing of any default within a reasonable time. In *Whitebread* the court stated the following:

> [M]ore than 12 months is ordinarily not a reasonable time to cure a default in prepetition homestead mortgage payments under 11 U.S.C. Sec. 1322(b)(5). . . .

*First Federal Sav. & Loan Asso. v. Whitebread,* 18 B.R. 192 (Bankr. D. Minn. 1982).

Because the debtor's plan does not cure the prepetition delinquency within a reasonable time, the plan does not comply with Section 1322(b)(5).  Therefore, the Plan should not be confirmed.

### CONCLUSION

SPS respectfully requests that the Court deny confirmation.

Dated: November 27, 2019

USSET, WEINGARDEN & LIEBO, P.L.L.P.

By: /E/ Kevin T. Dobie
Kevin T. Dobie #388322
4500 Park Glen Road, #300
Minneapolis, MN  55416
(952) 925-6888
kevin@uwllaw.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:
Todd David Morrow

Chapter 13
Case No. 19-43134 KHS

Debtor.

---

UNSWORN DECLARATION FOR PROOF OF SERVICE

---

I, Maria L. Aligah, employed on this date by USSET, WEINGARDEN & LIEBO
P.L.L.P., attorney(s) licensed to practice law in this court, with office address of 4500
Park Glen Road, Suite 300, Minneapolis, Minnesota 55416, upon penalty of perjury,
declares that on November 27, 2019, I served the annexed Notice of Hearing,
Objection to Confirmation of Plan, upon each of the entities named below by mailing
to them a copy thereof by enclosing same in an envelope with first class mail postage
prepaid and depositing same in the post office at Minneapolis, Minnesota, addressed
to each of them as follows:

Todd Morrow
12650 Xebec St. NE
Blaine, MN 55449

and delivered by email notification under CM/ECF on the day efiled with the court to
each of them as follows:

Office of the United States Trustee

Gregory A. Burrell, Chapter 13 Trustee

Jeffrey Leiviska, Esq.

/s/Maria L. Aligah
Maria L. Aligah

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Todd David Morrow

Chapter 13
Case No. 19-43134 KHS

Debtor.

---

ORDER

---

The above entitled matter came for hearing upon the motion of Select Portfolio Servicing, Inc. as servicer for Wilmington Trust, N.A., successor Trustee to CitiBank, N.A., as Trustee on Behalf of the Registered Holders of Bear Stearns Asset Backed Securities I Trust 2006-HE3, Asset-Backed Certificates, Series 2006-HE3 ("SPS") pursuant to 11 U.S.C. section 1322 on December 19, 2019, at the U.S. Bankruptcy Court, Minneapolis, Minnesota.   Appearances were as noted in the record.   Based upon the evidence adduced at said hearing, the arguments of counsel, and the court being fully advised of the premises,

IT IS ORDERED:

Confirmation of the debtor's chapter 13 plan is denied.

Dated:_____

_____
United States Bankruptcy Judge